## UNITED STATES of America

v.

## PLASSER AMERICAN CORP., Walter Hammerle.

### No. Crim.A. 99–133.

United States District Court, E.D. Pennsylvania.

July 7, 1999.

Peter F. Vaira, Vaira, Backstrom, Riley & Smith, Philadelphia, PA, Breckenridge L. Willcox, Arent Fox Kintner Plotkin & Kahn, Washington, DC, for Plasser American Corporation, defendant.

Terri A. Marinari, U.S. Attorney's Office, Philadelphia, PA, John J. Pease, U.S. Attorney's Office, Philadelphia, PA, D. Hamilton Peterson (of counsel), Deputy Counsel, National Railroad Passenger Corporation (Amtrak), Office of the Inspector General, Washington, DC, for U.S.

## MEMORANDUM

LUDWIG, District Judge.

Defendants Plasser American Corporation and its senior executive vice president Walter Hammerle move to dismiss Count Two of the information charging them with obstruction of a federal audit. 18 U.S.C. § 1516. On April 15, 1999, both defendants pleaded guilty to Count One, wire fraud. 18 U.S.C. § 1343. Under their plea agreements, they reserved the right to file the present motion, contending that they did not obstruct an audit "by or on behalf of the United States"—an essential element of the charge.

This criminal action stems from defendants' attempt in 1996 to defraud the National Railroad Passenger Corporation (Amtrak) and their subsequent efforts to conceal the fraud. Amtrak had contracted with defendant company, a manufacturer of reel trail railroad cars. Defendants concede having attempted to obstruct an audit conducted by Amtrak, but maintain that it was not a federal audit within the meaning of the criminal statute.[1]

---

1. Defendants also stipulated that if their motions are denied and the statute is found to be applicable, defendants waive the right of appeal. Plea agreement, ¶ 3(a). If the motions are granted, however, the government may

### I. Obstruction of a Federal Audit and the "United States"

██ The statute defining obstruction of a federal audit reads, in relevant part:

(a) Whoever, with intent to deceive or defraud the United States, endeavors to influence, obstruct, or impede a Federal auditor in the performance of official duties relating to a person receiving in excess of $100,000, directly or indirectly, from the United States in any 1 year period under a contract or subcontract ... shall be fined under this title, or imprisoned not more than 5 years, or both.

(b) For purposes of this section-

(1) the term "Federal auditor" means any person employed on a full- or part-time or contractual basis to perform an audit or a quality assurance inspection for or on behalf of the United States....

18 U.S.C. § 1516. Defendants and the government agree that the sole issue in dispute is whether the Amtrak audit qualifies as one performed "for or on behalf of the United States."[2] In other words, (1) did defendants willfully attempt to deceive or defraud the United States, and (2) can an Amtrak employee be deemed "a Federal auditor" under § 1516(b)?

### II. Amtrak's Status as a Federal Agency

Congress has gone so far as to legislate that Amtrak "is not a department, agency, or instrumentality of the United States Government." 49 U.S.C. § 24301(a)(3) (1997) (amended in 1997 to add the phrase "and shall not be subject to title 31") (formerly enacted as 45 U.S.C. § 541). Legislative history emphatically confirms Congress's intent not to consider Amtrak to be a federal agency. See H.R.Rep. No. 91–1580, at 5 (1970) (Passenger Train Service), reprinted in 1970 U.S.C.C.A.N. 4735, 4739 ("For the purpose of providing intercity rail passenger service, a private, for profit corporation would be established under the District of Columbia Business Corporation Act. The corporation would not be an agency or establishment of the United States Government.") (emphasis in original); see also H.R. No. 100–771, at 16 (1988) (Inspector General Act Amendments of 1988), reprinted in 1988 U.S.C.C.A.N. 3154, 3169 ("The Committee recognizes that it has taken many years of litigation for [Amtrak] to establish that it should not be considered an agency of the United States. Including Amtrak as a "designated federal entity" is not intended to overturn this result.").

Decisional law in a variety of contexts has uniformly been in accord with Amtrak's non-federal agency status. See Hrubec v. Nat'l R.R. Passenger Corp., 49 F.3d 1269, 1270 (7th Cir.1995) (Amtrak workers are not "employees of the United States"); Nat'l R.R. Passenger Corp. v. Florida, 929 F.2d 1532, 1535 n. 7 (11th Cir.1991) (Amtrak is not a federal entity for purposes of the Anti–Injunction Act); Nat'l R.R. Passenger Corp. v. Two Parcels of Land, 822 F.2d 1261, 1264 (2d Cir.1987) (not a "governmental body" that can exercise the sovereign power of eminent domain); Anderson v. Nat'l R.R. Passenger Corp., 754 F.2d 202, 204 (7th Cir.1984) (Amtrak's actions in terminating an employee do not constitute governmental action for purpose of Fifth Amendment due process); Riddle v. Nat'l R.R. Passenger Corp., 831 F.Supp. 442, 446 (E.D.Pa.1993) (not entitled to benefit of qualified immunity doctrine); Held v. Nat'l R.R. Passenger Corp., 101 F.R.D. 420, 423 (D.D.C.1984) (not a government entity for purposes of the Age Discrimination in Employment Act); Sentner v. Amtrak, 540 F.Supp. 557, 560 (D.N.J.1982) ("not a United States government agency, establishment or instrumentality, and therefore may be sub-

---

appeal. In either event, defendants will plead guilty to Count Two, if it survives. Id., ¶ 3(b).

**2.** The parties have stipulated to facts comprising the other elements of the offense. Plea agreement, ¶ 2(c).

ject to liability for punitive damages."); *National R.R. Passenger Corp. v. Commonwealth of Pennsylvania Public Utility Com'n*, 1997 WL 597963, at *3–6 (E.D.Pa. Sept.15, 1997) (not a federal entity exempt from the bar of the Eleventh Amendment).

Nevertheless, Amtrak has been held to be "an agency or instrumentality of the United States for the purpose of individual rights guaranteed against the Government by the Constitution." *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 392–94, 115 S.Ct. 961, 971–72, 130 L.Ed.2d 902 (1995) (Amtrak's conduct may be state action vis-a-vis the First Amendment). Accordingly, Congress cannot demarcate Amtrak's status in derogation of the Constitution. The Court also observed, however, that "Section [24301(a)(3) ] is assuredly dispositive of Amtrak's status as a Government entity for purposes of matters that are within Congress's control—for example, whether it is subject to statutes that impose obligations or confer powers upon Government entities...." *Id.*, at 392, 115 S.Ct. at 971. Unquestionably, the delineation and scope of a specific criminal offense are for Congressional determination. *See United States v. Kozminski*, 487 U.S. 931, 939, 108 S.Ct. 2751, 2758, 101 L.Ed.2d 788 (1988). And no constitutional protection attaches to the offense of obstructing a federal audit that would somehow augment the definition of "United States" to include an agency expressly denied federal status by Act of Congress. It therefore follows at least facially that Amtrak's audit was not a federal audit within the contemplation of 18 U.S.C. § 1516.[3]

### III. Title 18 U.S.C. § 6

Taking the position that Congress intended Amtrak to be considered the "Unit-

ed States" or a federal agency under 18 U.S.C. § 1516, the government offers arguments based on statutory construction. First, it refers to 18 U.S.C. § 6, which defines a title 18 "agency" to include "a corporation in which the United States has a proprietary interest."[4] Section 6, in relevant part:

> The term "agency" includes any department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest, unless the context shows that such term was intended to be used in a more limited sense.

18 U.S.C. § 6.

Though Amtrak is a corporation "in which the United States has a proprietary interest, ... the context shows that [agency] was intended to be used in a more limited sense." *Id.* Amtrak comes within the § 6 general definition of agency, but § 24301(a)(3), the specific provision declaring its status to be that of a non-governmental entity, removes it. *See Edmond v. United States*, 520 U.S. 651, 657, 117 S.Ct. 1573, 1578, 137 L.Ed.2d 917 (1997) ("Ordinarily, where a specific provision conflicts with a general one, the specific governs.") (citing *Busic v. United States*, 446 U.S. 398, 406, 100 S.Ct. 1747, 1752–53, 64 L.Ed.2d 381 (1980)).

Moreover, § 6 was enacted in 1948; Amtrak's charter, in 1970. It is unlikely that Congress intended the earlier, general definition to override its later explicit pronouncement that Amtrak is not to be regarded as an agency. When Congress has

---

**3.** The government's assertion that § 24301 is not dispositive on whether Amtrak is the "United States" as used in 18 U.S.C. § 1516 is undermined by the illustration given in *Lebron* suggesting just the opposite. Arguments based on federal funding, control, or proprietary interest in Amtrak do not alter the analysis. Congress was aware of these matters when it enacted § 24301 and its predecessor, § 541.

**4.** On the other hand, Plasser American urges that the "United States" as used in § 1516 does not include any governmental agencies. It distinguishes the statute from others in which Congress used the phrase "the United States, or any department or agency thereof." Def. Plasser mot., 12–15.

intended to confer governmental powers or duties on Amtrak, it has done so with specific and unequivocal language.[5] *See, e.g.,* 31 U.S.C. § 1352 (Amtrak, as a mixed-ownership corporation, is an agency under the Byrd Amendment, prohibiting federal contract recipients from using federal funds to pay lobbyists); 42 U.S.C. § 12131(c) (a public entity under the American with Disabilities Act); 49 U.S.C. § 24301(1) (exempt from state and local taxes); 49 U.S.C. § 24301(e) (subject to Freedom of Information Act, 5 U.S.C. § 552).[6]

## IV. Amtrak as a Federal Grant Recipient

Defendants' fraud involved a contract that was funded by a federal grant to the Federal Railroad Association for Amtrak's use. The government argues that these federal monies converted Amtrak's auditor into a federal auditor acting "for or on behalf of the United States," 18 U.S.C. § 1516(b)—relying, by analogy, on *Dixson v. United States,* 465 U.S. 482, 104 S.Ct. 1172, 79 L.Ed.2d 458 (1984).

In *Dixson,* defendants were managers of a community-based organization hired by the city of Peoria, Illinois to administer a federal grant. Defendants were convicted of violating the criminal prohibition against bribery of a public official. 18 U.S.C. § 201 "officer or employee or person acting for or on behalf of the United States." The Court, five to four, found that the term "public official" extends to employees of organizations who possessed "some degree of official responsibility for carrying out a federal program or policy." *Dixson,* 465 U.S. at 499, 104 S.Ct. at 1181.

The *Dixson* majority leaned heavily on legislative history and concluded that the statute was intended to have a "broad jurisdictional reach." *Dixson,* 465 U.S. at 492–500, 104 S.Ct. at 1177–82. In contrast, the legislative history of 18 U.S.C. § 1516 is sparse and unilluminating.[7] Read literally, § 1516(a) speaks of "a Federal auditor in the performance of official duties"—not an Amtrak auditor conducting an Amtrak audit. Section § 1516(b) defines a "Federal auditor" as "any person employed ... to perform an audit ... for or on behalf of the United States." However, it would be a difficult if not convoluted construction to include an Amtrak employee who is auditing an Amtrak contract with a third party. Having ruled that Amtrak is not a federal agency, excepting in the limited instances noted, it is all the more difficult to say that the Amtrak auditor was acting for or on behalf of the United States. *Id.* The connection that remains is the presence of federal funding.

5. The government has not cited any cases, and there appear to be none, in which Amtrak has been considered to be a federal agency or department, or otherwise has been equated with the United States relative to a criminal statute.

6. Amtrak implicitly signified its general status as a nongovernmental agency in its contract with defendants: "Solely for purposes of completing the Certification Regarding Lobbying and the Disclosure Activities forms, the Contract is considered a Federal Contract and a Federal Action, and Amtrak is considered a Federal agency." Def. Plasser mot., ex. C, ¶ 8(b); *see also* def. Plasser mot., ex. B, at 10 (purchase order from Amtrak to defendants with similar language related to Byrd amendment). Contrary to the government's contention that defendants were put on notice that Amtrak was a federal agency a more plausible interpretation is that Amtrak was not a federal agency excepting for the Byrd Amendment prohibition on lobbying.

7. It was enacted as part of the Anti–Drug Abuse Act of 1988. Pub.L. No. 100–690, § 7078, 102 Stat. 4181, 4406. At the time of its proposal, Senator Biden stated:

The experience of the Department of Justice has shown that, in many successful investigations, government contractors have been able to avoid earlier detection by obstructing [ ] audits. The federal auditor needs the same protection for obstruction that the investigator, administrative proceedings, and the grand jury have in sections 1503, 1505, 1510, and 1512 of title 18....

134 Cong.Rec. 32692, 32703 (1988). Notably, these remarks are confined to federal auditors' examinations of government contracts.

However, after *Dixson*, the argument that "the recipient of federal financial assistance and the subject of federal supervision, may itself be treated as 'the United States'" was rejected by the Court. *Tanner v. United States*, 483 U.S. 107, 129, 107 S.Ct. 2739, 2752, 97 L.Ed.2d 90 (1987) (conspiracy to defraud a private corporation receiving federal assistance did not violate criminal statute prohibiting conspiracy to defraud the United States, 18 U.S.C. § 371). The Court distinguished *Dixson* by noting that its broad interpretation of the bribery statute was supported by legislative history. Without the justification of clear-cut language or explanatory legislative history, the Court applied the rule of lenity and refused to "expand the reach of a criminal provision by reading new language into it." *Tanner*, 483 U.S. at 131, 107 S.Ct. at 2753.

The government regards the present case as closer to *Dixson* than to *Tanner* because of the tight federal control exerted over the funds received by Amtrak. The grant required Amtrak to protect the public's interest in the use of federal funds. Its duties were couched in broad principles—"Amtrak shall carry out the project ... in a sound, economical, and efficient manner ...," gov't sur-reply, ex. A, § 121—and also in specific obligations—monthly reports to the Federal Railroad Administration and annual accounting of funds and disbursements. *Id.*, at §§ 211, 307. The Department of Transportation reserved the right to perform a final audit at the completion of the project. *Id.*, at § 308.

*Tanner* considered the same type of argument. "Given the immense variety of ways the Federal Government provides financial assistance, and the fact that such assistance is always accompanied by restrictions on its use," the "substantial supervision" test of the governmental status of grant recipients is unreliable. *Tanner*, 483 U.S. at 132, 107 S.Ct. at 2753. It is even less clear that the control over Amtrak's use of the grant funds would render an Amtrak employee a federal auditor under 18 U.S.C. § 1516.

Whether the degree of federal control that existed in this case rises to that found in *Dixson* is not itself determinative. Missing is the legislative history to support a finding that Congress intended § 1516 to have the same broad parameters as those discerned in *Dixson*.[8]

### V. The Rule of Lenity

■ Given the facts of this case, the rule of lenity circumscribes the construction of § 1516, in particular as to the terms "United States" and "Federal auditor." *See Hughey v. United States*, 495 U.S. 411, 422, 110 S.Ct. 1979, 1985, 109 L.Ed.2d 408 (1990) (lenity principles "demand resolution of ambiguities in criminal statutes in favor of the defendant"); *Crandon v. United States*, 494 U.S. 152, 160, 110 S.Ct. 997, 1002–03, 108 L.Ed.2d 132 (1990) ("Because construction of a criminal statute must be guided by the need for fair warning, it is rare that legislative history or statutory policies will support a construction of a statute broader than that clearly warranted by the text."); *United States v. Pollen*, 978 F.2d 78, 85 ("[W] hen ambiguity in a criminal statute cannot be clarified by either its legislative history or inferences drawn from the overall statutory scheme, the ambiguity is resolved in favor of the defendants."); *see also United States v. R.L.C.*, 503 U.S. 291, 305–06, 112 S.Ct. 1329, 1338, 117 L.Ed.2d 559 (1992) ("[W]e have always reserved lenity for those situ-

---

**8.** *Dixson* appears to stand by itself, and Justice Scalia has questioned its jurisprudential soundness. *See United States v. R.L.C.*, 503 U.S. 291, 310, 112 S.Ct. 1329, 1340–41, 117 L.Ed.2d 559 (1992) (Scalia, J., concurring) ("[O]nly once, to my knowledge, have we relied on legislative history to 'clarify' a statute, explicitly found to be facially ambiguous, against the interest of ·a criminal defendant.... I think *Dixson* weak (indeed, utterly unreasoned) foundation for a rule of construction that permits legislative history to satisfy the ancient requirement that criminal statutes speak 'plainly and unmistakably....'") (citations omitted).

ations in which a reasonable doubt persists about a statute's intended scope even after resort to 'the language and structure, legislative history, and motivating policies' of the statute.") (citations omitted).

Applying the rule here serves both of its two underlying principles: "fair warning ... in language that the common world will understand, of what the law intends to do if a certain line is passed, ... [and] because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity." *Gov't of the Virgin Islands v. D.W.,* 3 F.3d 697, 699 (3d. Cir.1993) (quoting *United States v. Bass,* 404 U.S. 336, 348, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971)). Defendants no doubt knew that Amtrak was the recipient of federal funds, but that knowledge by itself does not overcome the statutory construction problems of § 1516 that are posed by these facts. A cover-up or distortion of figures in dealing with an Amtrak auditor is not commonly thought of as obstructing a federal audit. By Act of Congress, Amtrak is not permitted to hold itself out as a constituent part of the United States, *i.e.* a federal agency. To find these defendants guilty of § 1516 would be to re-write the criminal statute and to ignore the rule of lenity.[9]

Accordingly, Count Two as to both defendants will be dismissed.

---

9. It begs the question to argue that defendants do not deserve the benefit of the rule of lenity because they knew their conduct was criminal. Gov't. mem., at 33. The relevant question is whether their conduct was fairly within the scope of § 1516. That statute requires a particular target—the United States—and a particular method—a federal auditor. *See Tanner v. United States,* 483 U.S. 107, 130, 107 S.Ct. 2739, 2752, 97 L.Ed.2d 90 (1987) ("The conspiracies criminalized by § 371 are defined not only by the nature of injury intended by the conspiracy, and the method used to effectuate the conspiracy, but also—and most importantly—by the *target* of the conspiracy. Section 371 covers conspiracies to defraud 'the United States or any agency thereof'....") (emphasis in original).